**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE:<br><br>City Loft Hotel, LLC,<br><br>Debtor.<br><br>IN RE:<br><br>City Loft, LLC,<br><br>Debtor. | C/A No. 11-06127-dd<br><br>Chapter 11<br><br>C/A No. 11-06160-dd<br><br>Chapter 11<br><br>**ORDER** |

City Loft Hotel, LLC ("CLH") and City Loft, LLC ("City Loft") (collectively, "Debtors") filed Motions for Substantive Consolidation ("Consolidation Motions"), seeking merger of the two bankruptcy estates, on December 19, 2011, and Bank of the Ozarks ("Bank") filed an Objection to the Consolidation Motions on January 6, 2012. The Court previously ordered the joint administration of the two bankruptcy cases under the CLH case number in an Order entered November 16, 2011. Bank filed a Motion for Relief from Stay ("Stay Motion"), a Motion to Prohibit Use of Cash Collateral ("Cash Collateral Motion"), and a Motion to Designate the Case as a Single Asset Real Estate Case ("SARE Motion") on November 22, 2011. Bank is a creditor of City Loft, and Bank's Motions therefore relate to the City Loft bankruptcy case. Debtors filed Objections to Bank's Motions on December 6, 2011. Finally, an Application for Compensation ("Application") was filed by counsel for Debtors on November 22, 2011, and Bank filed an Objection to that Application on December 12, 2011. Hearings were held on January 24, 2012. The Court denied the Consolidation Motions and took the remaining matters under advisement. The Court now makes the following Findings of Fact and Conclusions of Law.

# **FINDINGS OF FACT**

The property that is the subject of these bankruptcy cases is a 23 room boutique hotel located in downtown Beaufort, South Carolina. The hotel was originally constructed in the 1960s and operated as Lord Carteret Motel and later as a Red Carpet Inn. In late 2006, Matthew McAlhaney, the principal of both City Loft and CLH, determined that he wanted to purchase the property and re-develop the building into condominiums which could be purchased for residential or vacation use. In 2007, Mr. McAlhaney formed City Loft, and City Loft obtained an acquisition and development loan in the amount of $3,910,000 from Woodlands Bank. City Loft purchased the hotel for $2,000,000 and began the condominium conversion process. The loan from Woodlands Bank to City Loft is secured by a mortgage on the hotel property and an assignment of rents. In April 2008, CLH was formed as an operating entity to facilitate the rental of condominium units whose owners chose to rent them as vacation rentals.

Due to construction issues and the worsening economy, Mr. McAlhaney revised his plan and decided to develop the building into a boutique hotel rather than a condominium complex. At that time, a number of condominium units were under contract, and the purchasers had paid deposits of ten percent of the sales price. Finishing construction and resolving the issue of the units under contract required additional funding, which Mr. McAlhaney obtained. Mr. McAlhaney testified that he added eight percent interest to the amount of the deposits he received from the condominium unit contracts and refunded about seventy percent of the total amount to the purchasers. The hotel opened in September 2009. CLH has managed and carried out all business operations, beginning with preparation in spring 2009 for the opening of the hotel. City Loft remains the owner of the property, but otherwise has no business operations.

There is no formal agreement for CLH's operation of the property, and Mr. McAlhaney did not articulate a reason for the existence of two entities in the context of the hotel operation that evolved from the failed condominium conversion.

In addition to the 23 hotel rooms, located on the real property owned by City Loft are a coffee shop called City Java and a fitness center. City Java is owned by Mr. McAlhaney and his wife; it is not owned by or otherwise connected to City Loft or CLH. City Java serves the public and also provides food for the hotel's room service offerings. From March 2010 to March 2011, the fitness center was leased by a third party. Mr. McAlhaney testified that from March 2011 until very recently, a personal trainer paid to use the facility for his personal training sessions. Guests of the hotel have access to the fitness center during their stay. Additionally, memberships for use of the fitness center are available to, and are held by, local residents, although it was not clear from the evidence presented at the hearing how many residents currently hold memberships to the facility. No evidence was presented regarding whether memberships are still available for purchase or whether those residents holding memberships had purchased their memberships during the period the center was leased by a third party. Mr. McAlhaney testified that membership fees, as well as the payments from the personal trainer who used the facility, are collected and retained by CLH.

Three appraisals were recently performed on the property. The first was performed by Mark Peterson for Bank in November 2010 and found that the value of the property, not including furniture, fixtures, and equipment ("FF&E"), was $2,480,000. The second appraisal was performed in November 2011 by Anton Sedalik, an associate employed by Mark Peterson. That appraisal found the value of the property without FF&E to be $2,750,000. The final

appraisal was prepared for Debtors by James Martin. That appraisal, completed in January 2012, found the value of the property to be $1,950,000.

Mark Peterson and James Martin both hold an MAI designation.[1] Both appraisers testified at the hearing regarding the methodology used to arrive at the values stated in their appraisals. The methodologies used by the appraisers were substantially similar; both appraisers used the income approach to determine the value of the property, as hotel and motel appraisals for on-going operations present unique issues which render a sales comparison approach often unreliable. The difference in the values arrived at by Mr. Peterson and Mr. Martin appears to be primarily due to the average daily room rate the appraisers used to calculate the hotel's projected income. Mr. Martin used an average daily rate of $130. In the 2011 appraisal, Mr. Peterson testified that his firm used an average daily rate of $145, resulting in a substantially higher appraisal value than Mr. Martin's appraisal. Evidence presented by Debtors indicated that the hotel's actual average daily rate during 2010 and 2011, calculated by month, ranged between $108 and $160.

Bank's financial expert, William Hickman, a CPA, prepared a report and testified at the hearing regarding CLH's financial circumstances. Mr. Hickman's report, prepared using the monthly operating reports filed by CLH for October, November, and December 2011, shows cash profit before debt service payments of $14,290, $12,666, and $4,406, respectively. These amounts are insufficient to make principal and interest payments on a first mortgage on the property, assuming a $2,200,000 principal amount[2] and an interest rate which Mr. Hickman

---

[1] An MAI designation is a professional designation awarded by the Appraisal Institute to appraisers meeting certain education and experience requirements.

[2] Mr. Hickman used $2,200,000 because that amount is 80 percent of the appraisal value of the property, based on the appraisal completed by Mr. Sedalik in November 2011. As explained below, Mr. Hickman testified that the maximum amount of financing CLH would be able to obtain in the current financial market would be 80 percent of the appraised value of the property.

testified was typical in the current market. On cross-examination, Mr. Hickman was questioned about the projected net income figures in the November 2011 appraisal prepared by Mr. Sedalik. Mr. Sedalik's appraisal projected net income for the period from December 1, 2011 to November 30, 2012 of $211,936. Mr. Hickman conceded that this amount, if realized, would be sufficient to make debt service payments on a loan in the amount of $1,800,000 to $2,000,000.

Mr. Hickman also testified regarding CLH's financial affairs in 2010. Mr. Hickman testified that during 2010, CLH had a net loss every month, and the total loss for 2010 was $298,765. Mr. Hickman also testified that during 2010 CLH's accounts payable increased from $223,150 to $499,260, indicating that CLH was unable to pay its bills. Finally, Mr. Hickman testified that based on the current market and Debtors' financial situation, Debtors would likely not be able to obtain financing at all, and in no case would Debtors be able to refinance more than 80 percent of the appraised value of the property.

In July 2010, Woodlands Bank was closed by the Federal Deposit Insurance Corporation (FDIC), and its assets were taken into receivership by the FDIC. Bank purchased many of the Woodlands Bank assets from the FDIC, including City Loft's loan. In November 2009, City Loft defaulted on the loan and Woodlands Bank proceeded with legal action against City Loft. A foreclosure action was filed by Woodlands Bank. Later, after the loan was acquired by Bank, Bank filed a motion in the foreclosure proceeding for the appointment of a receiver. The bankruptcy petitions stayed the foreclosure proceeding.

## **CONCLUSIONS OF LAW**

**I. Substantive Consolidation**

City Loft and CLH argue that the respective bankruptcy estates should be substantively consolidated because "(i) the Debtors conducted their administrative, operational and financial affairs and business through CLH, such that the Debtors collectively constituted one entity factually and legally; (ii) Matthew McAlhaney, individually and through Gladstone Group, LLC, a wholly owned related company, is the sole beneficial owner of both Debtors; (iii) the Debtors relied upon a network of intercompany transactions which may not be reflected [sic] Debtors' books and records; and (iv) the primary asset of [City Loft] is real property located at 301 Carteret Street in Beaufort, South Carolina, upon which is situated the hotel building in which CLH operates." Motion to Consolidate Case 11-06127-dd with Associated Case(s) 11-06160, docket #48, pg 2. Bank responds that the cases should not be substantively consolidated because there are two distinct sets of creditors and because it would be "significantly harmed" if the cases were combined. Bank argues that City Loft and CLH seek to substantively consolidate their bankruptcy cases in order to avoid a possible fraudulent transfer issue based on the fact that the income generated by the property owned by City Loft is collected and maintained by CLH.

Substantive consolidation is an equitable remedy, and the Court has broad discretion under 11 U.S.C. § 105 to determine whether substantive consolidation is appropriate. *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 487 (Bankr. D.S.C. 2010) (citing 2 Collier on Bankruptcy ¶ 105.09[d][2] (16th ed. 2010)); *In re Derivium Capital, LLC*, 380 B.R. 407, 426 (Bankr. D.S.C. 2006). This Court has previously adopted the test set forth in *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) to determine whether to substantively consolidate bankruptcy estates. That test provides that substantive consolidation is appropriate "1) [if] creditors dealt

with the entities as a single economic unit and did not rely on separate identities in extending credit or 2) when the affairs of the debtor are so entangled that consolidation will benefit all creditors." *Gyro-Trac*, 441 B.R. at 487 (quoting *In re Derivium Capital, LLC*, 380 B.R. 429, 441–42 (Bankr. D.S.C. 2006)). Substantive consolidation can significantly affect creditors' rights in a bankruptcy case; as a result, it should be used sparingly and should not be granted simply for purposes of procedural convenience. *Id.* (citing *In re Augie/Restivo Banking Co.*, 860 F.2d 515, 518 (2d Cir. 1988)). Regardless of the standard used by the Court to evaluate substantive consolidation, "the bankruptcy court [must] make extensive evidentiary findings before determining the consolidation issue." *In re Peramco Int'l, Inc.*, 242 B.R. 313, 317 (E.D. Va. 2000), *rev'd on other grounds*, 3 Fed. Appx. 38 (4th Cir. 2001).

City Loft and CLH did not satisfy their burden of establishing that substantive consolidation of the bankruptcy estates is appropriate. While Mr. McAlhaney is the principal of both Debtors, the entities were formed at different times for different purposes and have distinct and separate creditors. Evidence presented by Bank established that it dealt solely with City Loft when extending financing, and until CLH filed bankruptcy, Bank was not even aware that CLH existed. The creditors of CLH deal only with CLH and look to it for payment of the operating expenses of the hotel, as they have done from the hotel's inception. City Loft has no business operations. City Loft's creditors are bank, certain mezzanine investors who funded re-development costs, and any residual claims arising from the condominium unit contracts. While the Consolidation Motion states that there were numerous "intercompany transactions" not reflected on either entity's books or records, no evidence was presented to the Court that there were any such transactions. Neither element of the *Augie/Restivo* test has been met. The Motions for Substantive Consolidation are denied.

## II. Single Asset Real Estate

Bank argues that City Loft's case is a single asset real estate case because its sole asset is a single piece of real property. "Single asset real estate" is defined in 11 U.S.C. § 101(51B) as:

> real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

City Loft's bankruptcy case is a single asset real estate case. City Loft's only assets are the real property on which the hotel is located and the hotel itself. No business is actually conducted by City Loft. It does not operate the hotel or the other businesses on the property and does not, at present, receive any income. The absence of income does not preclude a case from being a single asset real estate case, despite the fact that a part of the test for the determination is that the real property "generates substantially all of the gross income of a debtor . . . ." 11 U.S.C. § 101(51B). City Loft is the owner of the property and is entitled to either the income produced by the hotel or some other return from the operation of the hotel. If this were not the case, every single asset real estate debtor could defeat the provisions of the Bankruptcy Code simply by forming a business entity to receive all of the income produced by the property. City Loft's case is a single asset real estate case. Bank's SARE Motion is granted.

## III. Use of Cash Collateral

Bank's Cash Collateral Motion requests that the Court prohibit the further use of cash collateral and deny any request by Debtors for the use of cash collateral, although neither debtor has made such a request. Cash collateral use is governed by section 363 of the Bankruptcy Code. Section 363(b)(1) provides that a debtor in possession may "use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 363(c)(1) provides that the

debtor in possession can use property of the estate in the ordinary course of business without notice or a hearing; however, section 363(c)(2) provides that the debtor in possession cannot use, sell, or lease cash collateral under section 363(c)(1) unless: "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

While CLH operates the hotel and receives all revenue generated by the hotel, there is no agreement with City Loft for that operation. City Loft is the owner of the real property and the building located on the real property. Because Bank has a lien on the property and an assignment of rents, the revenue generated by the property is Bank's cash collateral. This result cannot be circumvented by the formation of an additional entity and the diversion of income from City Loft without any agreement. Bank has not consented to any use of cash collateral, and neither City Loft nor CLH has requested that the Court authorize use of cash collateral. Neither of the requirements of section 363(c)(2) have been met. Debtors are prohibited from any further use of Bank's cash collateral.

### IV. Motion for Relief from Stay

Bank seeks relief from stay under section 362(d)(1) and section 362(d)(2). Those subsections provide:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>     (A) the debtor does not have an equity in such property; and
>     (B) such property is not necessary to an effective reorganization.

Bank argues that it is entitled to relief from stay for cause under section 362(d)(1) due to City Loft's "failure to provide adequate protection payments, the failure to seek court approval for the use of cash collateral and the apparent fraudulent conveyance of the income from City Loft, LLC to City Loft Hotel, LLC without reasonable equivalent value."  Motion for Relief from Stay, docket #27, pg 4.  Bank argues that it is further entitled to stay relief under section 362(d)(2) because no party disputes that there is no equity in the property, because City Loft generates no income, and because even if the income of CLH could be considered, that income is insufficient to fund a plan of reorganization.

The Court finds that Bank is entitled to relief from stay under section 362(d)(2). There is no equity in the property.  The total owed to Bank at the date of the bankruptcy filing was $4,242,965.72, and City Loft's schedules list the value of the property at $2,500,000.  Three appraisals on the property have been completed since November 2010, and the highest appraisal value was $2,750,000.  The most recent appraisal, prepared in January 2012 for Debtors, appraised the property at $1,950,000.  Clearly, City Loft has no equity in the property.

As to the second element of the two-step test under section 362(d)(2), the United States Supreme Court has stated:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means . . . there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988) (quoting *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 370, nn. 12, 13 (5th Cir. 1987)) (emphasis original).

Here, City Loft owns the real property and the building in which the hotel and businesses are located, but does not manage any of the operations and does not receive any income from them. While City Loft would ordinarily be entitled to income generated by the property, as discussed above, it does not actually receive any income. Without income or operations, City Loft will be unable to implement any plan of reorganization. Since City Loft does not have the ability to successfully reorganize, the property is not necessary to its reorganization. Bank is entitled to relief from stay under section 362(d)(2).

Bank is also entitled to relief from stay under section 362(d)(1). Bank presented evidence at the hearing that no payments have been made to it in 26 months. While Mr. McAlhaney testified that he had attempted on numerous occasions to make payments through CLH, the financial data presented at the hearing showed that the income generated by CLH is not sufficient to make adequate debt service payments. Additionally, while some evidence was presented by Debtors that the hotel's number of reservations and therefore the hotel's income was increasing, it is not clear how much the hotel's income will continue to increase over time, if at all. There was also testimony that the property value is rising. While rising property value can in some circumstances adequately protect a creditor's lien, the rise in value in this case is offset by the fact that the Bank's cash collateral is disappearing. Since Bank has a lien on the cash collateral and it is being dissipated, Bank's interest is not adequately protected. The Court finds that cause for relief from stay has been established under section 362(d)(1). Bank is entitled to relief from stay under section 362(d)(1) and section 362(d)(2). The stay is lifted to permit Bank to resume its foreclosure and seek the appointment of a receiver.

**V. Application for Compensation**

The final matter before the Court is an Application for Compensation filed by counsel for Debtors. The Application requests authorization for attorney fees in the amount of $10,128 and expenses in the amount of $1,171.84. Bank filed an objection to the Application; however, the objection relates solely to the payment of the fees from the Bank's cash collateral. The Court finds that the fees requested in the Application are reasonable and should be approved. However, based on the Court's ruling regarding the use of cash collateral, Debtors are not permitted to use cash collateral to pay the fees.

**CONCLUSION**

For the reasons set forth above, City Loft and CLH's Motions for Substantive Consolidation are denied. Bank's Motion to Designate Case as Single Asset Real Estate Case is granted, and City Loft's bankruptcy case will be designated as a single asset real estate case going forward. Bank's Motion to Prohibit Use of Cash Collateral is granted, and Debtors are prohibited from further use of cash collateral. Bank is entitled to relief from stay under section 362(d)(1) and (d)(2), and Bank's Motion for Relief from Stay is granted. The compensation requested by counsel is approved, but cash collateral may not be used to pay the fees.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**01/31/2012**



David R. Duncan
US Bankruptcy Judge
District of South Carolina

Entered: 02/01/2012